"Q. And that's all he did was to unbutton his clothes? A. Yes, sir.

"Q. That's all."

Counsel for the defendant states that if it has been proved that the defendant was guilty of any crime, it should have been "assault, beating and wounding" and not "assault with intent to rape." He points out that the young woman immediately after the occurrence told the witnesses to apprehend the accused because he had beaten her, but she did not say that he had attempted to rape her. The patrolman who arrested the accused stated that, after bringing him before the young woman at the Charity Hospital where he interviewed her and she identified the defendant, he booked the defendant with the charge for which he was subsequently tried. The arrest book of the First Precinct Police Station corroborated his testimony as it shows that the accused was arrested and booked with attempt to commit rape on the prosecuting witness at 228 South Prieur Street, the entry in the book being made on January 31, 1940, at 6:45 p. m.

The facts and circumstances in the record which tend to show that the defendant intended to commit the crime charged, and not assault and battery or assault with intent to commit robbery, were:

(1) That he went upstairs into the young woman's apartment after she had told him not to come into the building; (2) that he said "I want you" and grabbed her; (3) that he pushed her into the bathroom; (4) that he struck her several hard blows in the face with his fist, knocking her down each time and causing serious and painful injuries; and (5) that he then unbuttoned his pants.

It must be borne in mind that the young woman's testimony is fully corroborated in every respect, except as to what happened between the parties inside of the building. However, the witnesses do state that she was hollering and screaming while in there and that she followed the defendant almost immediately out of the yard, with her face badly injured and bleeding and in an exhausted and hysterical condition, and accused him of having beaten her. The fact that she·was promptly sent to the hospital on account of her injuries and condition explains why she did not go into details as to what happened until later at the hospital.

It is our opinion that the corpus delicti of the crime charged to the defendant was sufficiently proved by evidence independent of the confession.

For the reasons assigned the verdict of the jury and the sentence of the court are affirmed.

O'NIELL, C. J., dissents from the ruling on bill of exceptions No. 1.

## THORNTON v. MERCER.
### No. 6170.

Court of Appeal of Louisiana.
Second Circuit.
Nov. 1, 1940.

Rehearing Denied Nov. 29, 1940.

Cook, Cook & Egan and Albert T. Hughes, all of Shreveport, for appellant.

Harry V. Booth, of Shreveport, for appellee.

TALIAFERRO, Judge.

Plaintiff, an employee of defendant, on December 17, 1937, suffered a compound fracture of the left leg about four inches above the ankle, when a heavy section of iron pipe fell across it. The injury, it was conceded, rendered him totally disabled to perform manual labor of the character by which he gained subsistence. Compensation at the rate of $14.09 per week was paid him by defendant's insurer, Lloyds America of San Antonio, Texas, until March 1, 1939, a period of sixty-four weeks. Thereafter the insurer was placed in receivership in Texas and in Louisiana, and no further payments were made. On April 9, 1939, the present suit was instituted against the employer, a non-resident of the State of Louisiana, to recover workmen's compensation at the rate of $20 per week on the basis of permanent total disability. Jurisdiction was effected through issuance and levy of a writ of attachment.

The defendant answered without reservation and called in warranty the Louisiana receiver of the insurer company. He was dismissed from the suit on exception to the court's jurisdiction. The correctness of this ruling was not thereafter questioned; no appeal was taken therefrom.

Plaintiff prevailed below. Judgment in his favor for compensation at the rate of $14.09 per week, less payments made, for the period of disability, not exceeding, however, 400 weeks, was rendered. The writ of attachment was maintained and defendant appealed.

All issues in the case have ceased to be controversial except that relating to the extent of plaintiff's disability, if any, at time of and subsequent to the cessation of payments to him, and probable duration thereof.

On the day injured, plaintiff was carried to a sanitarium in the City of Shreveport and there treated for four weeks by Dr. Oxford, a competent orthopedic surgeon. Both bones of the leg were found to have been fractured. A deep, irregular shaped cut was inflicted across and on the sides of the shin. The bones were set and the limb placed in a plaster cast. This was removed on May 19th and appropriate metal brace then applied to immobilize the injured leg from knee down. Plaintiff was under Dr. Oxford's observation and treatment until December 1st, practically a year following the accident. He was examined by this physician, after leaving the sanitarium, at intervals of three weeks. X-ray pictures were taken of the injured member. Pus exuded from the wound, at times intermittently, for more than a year. At the date of first trial (June 1, 1939), the wound had entirely healed, so far as superficial inspection revealed.

Plaintiff contends and testified that he had honestly tried to use the injured leg by walking thereon and in doing light work about his little farm; that after each effort the leg would swell, ache and pain so severely that he had to desist; that it would "give way" and he would quickly become fatigued. He limps when walking.

In addition to Dr. Oxford several general practitioners of medicine gave testimony in the case; also Dr. Durham, who specializes in orthopedic surgery. During the trial, at the suggestion of defendant's counsel, the court appointed two other physicians to examine plaintiff and to make to the court a report of their findings and conclusion. This was done. Other X-ray pictures were made by them. The findings of fact of these physicians, so far as is.

needful to this discussion, and their conclusion, follow:

"* * * There is a slight deformity. The ankle shows good motion on flexion and extension. He complains of soreness in leg when manipulated.

"X-ray examination of the lower leg and ankle joint shows an old fracture of the tibia and fibula at junction of middle and lower third. Position is good and union thorough of both tibia and fibula. There are several small areas throughout the tibia indicating the use of metal screws in the past. Outline of the ankle is smooth and regular, indicating no pathology.

"Conclusion: It is our opinion that there is good union and good position, and use of the leg without the brace would hasten normal function and strength in a few months."

We assume that the "slight deformity" mentioned in this report refers to the angulation found by other physicians.

Plaintiff's physicians, while admitting satisfactory union of the injured bones, are certain that apposition is imperfect, resulting in a seventeen degree (17°) outward and a much lesser degree forward angulation of the tibia at the locus of the fracture, and the shortening of the leg of approximately one inch. These deformities, they reason, disturb the weight bearing alignment of the leg and produce the pain of which he complained, and to them may be accredited the tendency toward easy fatigue.

■ The medical testimony and X-ray pictures prove beyond doubt that the union of the broken tibia is firm and satisfactory. We are convinced that there is some angulation of the tibia at the site of the fracture, and that as a result of the fracture and non-perfect apposition, the left leg is nearly an inch shorter than the right. The preponderance of the medical testimony sustains the theory that the pain and fatigue are direct results of this angulation, augmented, as Dr. Durham says, by adhesions around the anterior tibial and toe extensor tendons. It is less certain that the shortness of the leg contributes to this result.

All the doctors who testified, save Dr. Oxford, are of the opinion that plaintiff at the date of trial was totally disabled to perform manual labor. Some thought this condition permanent while others believed it temporary. Dr. Oxford is of the opinion that the disability is twenty-five per cent. Dr. Durham believes that if the most favorable results are had, disability to the extent of twenty-five per cent would be permanent.

■ Defendant contends that plaintiff's disability is only partial and supports this position by reference to testimony to the effect that he does drive a small truck and performs chores about his little farm. We do not concur in the conclusion that these physical activities prove ability, even in part, to perform the heavy manual labor plaintiff had to perform for a living. These acts, it is certain, are conducive to normal functioning of the leg and foot, but from them it is not safe to assume that continued hard labor may also be performed by him. In this connection, defendant cites two instances of peg-legged men satisfactorily discharging heavy oil field work for him, such as plaintiff was performing. We do not doubt the correctness of this, but the peg portion of a leg is impervious to pain, aches and fatigue.

Defendant also parries by urging his willingness to give plaintiff employment yielding the same pay as he was receiving when injured, but he is unwilling to enter into a written contract covering such employment for a term of years. A complete answer to this proposition is this:

■ The injured employee has the right to stand upon and invoke the law in his favor. Rather than accept compensation in the nature of a pension over a period of months or years, and possibly lose the right, through peremption, to enforce his claim for workmen's compensation, he would prefer to have his right thereto judicially fixed and determined.

Defendant also argues that if plaintiff is to any extent disabled to work, he alone is to blame therefor, because of his failure or refusal to follow the advice and instructions of physicians. Dr. Oxford did specifically prescribe to plaintiff the sort of treatment the injured leg should be given after the removal of the cast. The record is silent as to whether this advice was followed to any extent. It must have been, at least to some extent, followed, since the wound finally healed. Plaintiff was not interrogated on the subject. He did not voluntarily touch upon it.

■ The ultimate effect of failure to follow a physician's instructions in a given case may not be accurately appraised. It

is always the better course to observe such instructions. An injured person has not, with impunity, the right to ignore them; and when he does so for the obvious purpose of delaying recovery and automatically extending the duration of compensation payments, he should be thwarted in his indefensible designs. The law is generous in its treatment of the honest though unfortunate laborer who has sustained injury; but will deal firmly with those who undeservedly try to enrich themselves at the expense of others. In the instant case, we would not be warranted, in view of the testimony, in holding that plaintiff wilfully failed to give his wounded limb the attention, which, all things considered, he should have. It is likely, but not certain, he did not systematically exercise it in the manner calculated to procure normal functioning as quickly as possible. If this be true, the extent of disability as a sequence is not, and, from the very nature of the case, cannot be established.

Defendant additionally argues that if plaintiff is entitled to recover at all, recovery should be:

(1) Limited to 175 weeks for loss of the use of the leg (Subsection 1[d] par. 8, Sec. 8 of Workmen's Compensation Law, Act No. 20 of 1914, is amended by Act No. 242 of 1928 § 1), and, alternatively:

(2) For not over 300 weeks as in case of temporary total disability (Subsection 1 [a] Sec. 8, of Workmen's Compensation Law).

Clearly the first proposition is not well founded. The provisions of the Employers' Liability Act relative to specific injuries have no application. The leg has not been lost; only its use for practical purposes has been temporarily or permanently destroyed.

As to the second proposition, much may be said for and against it. It is common knowledge that fractures of this character do not necessarily produce permanent disability, in whole or part. Unless unusual and unexpected complications arise, permanent disability is not anticipated. This is especially true where, as in the present case, the patient has had the benefit of competent medical and surgical services. Industry has legion of persons in its employ who perform satisfactory services in their respective spheres, including hard labor, who have suffered injuries like or very much similar to plaintiff's. However, at time of second trial, plaintiff's disability had covered nearly two years. Nearly all the physicians were unable to discern any improvement since the first trial, five months prior.

We are strongly of the belief that plaintiff will be able to resume hard work long before the lapse of 300 weeks from the time of the injury, and particularly so if he measurably gives his leg appropriate attention and treatment. If not well then, likely it will never be. But a strong preponderance of the testimony of the medical experts sustains the contention that complete recovery is extremely indefinite, while some are more pessimistic. Compensation payments, of course, will cease when the disability ceases.

In view of the situation, reflected from what we have said, the ends of justice will be best promoted by resolving the doubt as to the duration of the disability in plaintiff's favor. This will be consonant to the obvious spirit of the Employers' Liability Act and in keeping with the jurisprudence of this and other courts of the state construing its provisions. Schneider v. Travelers Insurance Company et al., La. App., 172 So. 580, and cases cited therein.

The safer course will be to fix the possible maximum period of payments at 400 weeks, rather than at 300 weeks. The greater includes the less. If disability ceases at end of, or prior to, 300 weeks, no harm will have been done by ruling as we have; while, on the other hand, should a limit of 300 weeks be fixed and the disability does not disappear within that time, injustice will be obvious.

We think the judgment appealed from should be, and it is hereby affirmed.